**SIGNED THIS: May 02, 2007**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARK ANTHONY BEETLER and | ) | |
| LORI ANNE BEETLER, fbda ABINGDON | ) | No. 06-80932 |
| FARM EQUIPMENT, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| SUSAN L. FREER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 06-8228 |
| | ) | |
| MARK ANTHONY BEETLER and | ) | |
| LORI ANNE BEETLER, | ) | |
| Defendants. | ) | |

### O P I N I O N

This matter is before the Court after trial on the Complaint filed by Susan L. Freer (MRS. FREER) against Mark A. Beetler (MR. BEETLER) and Lori A. Beetler (MRS. BEETLER) (together, the DEBTORS) alleging that the DEBTORS' failure to remit the proceeds from the sale of a consigned tractor gives rise to a nondischargeable debt.

**Facts**

The DEBTORS bought the business known as Abingdon Farm Equipment (AFE) in May, 1999, and operated it thereafter as a sole proprietorship, as a retail dealer of major brand farm equipment including Massey Ferguson, Heston, Black, Simplicity and Stihl. MR. BEETLER ran the business while MRS. BEETLER kept the books. At its zenith, AFE employed six people. Its financial troubles began in 2004 and AFE closed its doors on November 11, 2005.

MRS. FREER'S late husband, a gentleman farmer, purchased a Massey Ferguson Tractor and Loader (the "Tractor") in 2001 for $16,500 from AFE. After he passed away in April, 2003, MRS. FREER called MR. BEETLER and inquired whether he would buy back the Tractor. He declined to buy it back, but offered to sell it on consignment for a 10% commission. MRS. FREER verbally accepted his offer, but the agreement was never reduced to writing.

In August, 2003, MR. BEETLER picked up the Tractor and placed it on AFE's lot for sale. It sold on October 28, 2004, to Dennis Melvin for $12,000 cash, a price which included the purchase of a new mower valued at $1,996. So the $10,000 purchase price attributable to the Tractor generated a $1,000 commission for MR. BEETLER and $9,000 in net sale proceeds for MRS. FREER. MR. BEETLER did not remit to MRS. FREER any portion of the funds he received from Mr. Melvin. About a year later, on October 11, 2005, he sent her a check for $1,500 which, on the advice of her attorney, was not cashed. He made no other attempt to pay her any portion of the $9,000.

Beginning in the fall of 2003, MRS. FREER began to call MR. BEETLER about the status of the Tractor. He would tell her that it wasn't sold yet but people were looking at it or trying it out. Similar responses were given to her inquiries even after the Tractor was sold to Mr. Melvin. In the spring of 2005, MR. BEETLER told her he thought he had it sold to a kid who was starting a landscaping business. He asked whether MRS. FREER would be willing to accept installment payments from this person but she declined, insisting on full payment at the time of purchase.

In the fall of 2005, MRS. FREER, no longer willing to be put off by claims of no sale, called MR. BEETLER demanding payment and threatening to contact an attorney. Shortly thereafter, she received the $1,500 check in the mail, which prompted her to meet with her attorney. In addition to advising her not to cash the check, the attorney wrote to MR. BEETLER on October 19, 2005, inquiring about whether the Tractor was sold and the meaning of the partial payment of $1,500. On November 29, 2005, the attorney wrote a second letter threatening suit if full payment for the Tractor was not received in two weeks. MR. BEETLER did not respond to either letter.

In January, 2006, MRS. FREER went to AFE's business location and saw that it was closed. A sign was posted on the door with the name and phone number of a person to contact for information. She called the person who told her the Tractor had been sold to Mr. Melvin.

MRS. FREER sued the DEBTORS on February 2, 2006, for breach of contract and conversion, subsequently obtaining judgment by default in the amount of $11,250. Less than two months later, on June 14, 2006, the DEBTORS filed for bankruptcy relief under

Chapter 7. Throughout the entire course of events, MRS. FREER had no contact with MRS. BEETLER. MR. BEETLER testified that AFE struggled financially during most of 2004 and all of 2005. He testified that he never intended not to pay MRS. FREER. The funds received from Mr. Melvin were used to pay AFE's creditors.

**Consignments under the U.C.C.**

MRS. FREER seeks to have her claim for the Tractor sale proceeds determined nondischargeable under Section 523(a)(2), (4) or (6). In addition to generally denying liability under those provisions, the DEBTORS, asserting they were farm implement dealers who dealt in the kind of goods consigned by MRS. FREER, seek cover from Section 2-326 of the Uniform Commercial Code. 810 ILCS 5/2-326. Under that provision, goods held on sale or return are subject to the claims of the buyer's creditors as long as the goods are in the buyer's possession. MRS. FREER disputes the relevance of Section 2-326 to this nondischargeability action.

There is little doubt that the transaction at issue was a "consignment" as defined in UCC Section 9-102(a)(20). 810 ILCS 5/9-102(a)(20). UCC Article 9 applies to a consignment, 810 ILCS 5/9-109(a)(4), and the consignee is deemed to have the consignor's rights and title to the goods, at least for the purposes of determining the rights of creditors of and purchasers from the consignee, 810 ILCS 5/9-319.

MRS. FREER does not dispute that the DEBTORS had the power to sell and transfer title to the Tractor to Mr. Melvin. She is not attempting to recover the Tractor from him. Neither does MRS. FREER dispute that the Tractor may have been subject to the security interest of one or more of the DEBTORS' lenders while in their possession. This is not a

4

dispute between her and the DEBTORS' creditors or between her and the bankruptcy trustee as to the relative priority of her interest in the Tractor or its proceeds. In this Court's view, the provisions of the UCC, while they may have applicability to the consignment transaction for other purposes, have a role to play only in the outcome of the claim for embezzlement under Section 523(a)(4).

It would be easy to presume that fraud, misrepresentation, false pretenses, defalcation by a fiduciary, embezzlement and larceny, similar in nature, are all birds of a feather, almost fungible, so that proof of one is proof of any or all. MRS. FREER'S argument borders on this presumption. She says that MR. BEETLER was obligated to pay her 90% of the Tractor's sale price when the purchase money was received, that he failed to do so, that he thereafter lied to her about it, then filed bankruptcy, resulting in a loss to her of both the Tractor and the money. Having proved this chain of events, she argues, she surely must have a remedy under at least one of paragraphs (2), (4) or (6) of Section 523(a), though she never specifies which paragraph she believes provides her strongest case.

**Section 523(a)(4)**

Section 523(a)(4) provides that:

> (a) A discharge . . . does not discharge an individual debtor from any debt –
> * * *
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny . . . .

11 U.S.C. § 523(a)(4). In order to prevail under the fiduciary fraud portion of the statute, a creditor must prove that (1) a fiduciary relationship existed between her and the debtor, and (2) fraud or defalcation was committed by the debtor in the course of that relationship. *In re Monroe,* 304 B.R. 349 (Bankr.N.D.Ill. 2004).

Whether a debtor is a fiduciary under Section 523(a)(4) is a question of federal law. *In re Frain,* 230 F.3d 1014, 1017 (7th Cir. 2000). The federal definition of fiduciary for this purpose is narrower than under state law. The existence of the trust must predate the breach. The equitable remedy of a constructive trust or resulting trust is not included within the term since the trust obligations do not exist until the wrong is committed. *Id.; Matter of Marchiando,* 13 F.3d 1111, 1115 (7th Cir. 1994). Even if a trust is nominally in existence, but where no real duties of a fiduciary character are imposed in advance of the breach, the absence of such preexisting duties takes the trust outside of the scope of Section 523(a)(4). *Marchiando,* 13 F.3d. at 1116. A fiduciary relation that imposes real duties in advance of the breach is almost always characterized by a difference in knowledge or power between fiduciary and principal which gives the fiduciary a position of ascendancy over the principal. *Id.*

In *Matter of Woldman,* 92 F.3d 546 (7th Cir. 1996), a lawyer, Nye, referred a personal injury case to Woldman, another lawyer, to try it, with the contingent attorney fees to be split equally. Woldman settled the case receiving a fee of $45,000, but failed to pay Nye his share and then went bankrupt. Reasoning that Woldman owed Nye no preexisting fiduciary duties, with his only real duty being to honor the agreement to turn over half of any fees recovered to Nye, the court held that Woldman was not Nye's fiduciary within the "special meaning" that Section 523(a)(4) assigns to the term.[1]

The teaching of these Seventh Circuit cases leads to the clear conclusion that a fiduciary relationship did not exist between MRS. FREER and MR. BEETLER or AFE.

---

[1] The court also noted that while the parties characterized the case as one for fraud, it was better described as defalcation since there was no indication that Woldman intended from the beginning to keep Nye's half of the fees.

6

There is no contract that creates a trust or imposes fiduciary duties. Likewise, no statute deems a consignee to be a trustee or fiduciary of his consignor. Neither does Illinois have a common law doctrine that turns a simple consignment into a trust.

It is true that MRS. FREER is a sympathetic Plaintiff, a widow with little knowledge about farming or the purchase and sale of farm equipment, while MR. BEETLER is an expert in these matters. This discrepancy in sophistication aside, however, she had the right to terminate the consignment arrangement at any time before sale, to inspect the Tractor, to set the price for its sale and to disapprove any unacceptable terms of sale. There is no significant disparity in power between the parties under the terms of the oral contract.

Moreover, MR. BEETLER owed MRS. FREER no fiduciary duties prior to sale. An Illinois court might well impose a constructive trust on the proceeds, if identifiable, from the sale of consigned goods as an equitable remedy, but constructive trusts are not covered by Section 523(a)(4). And while it is true that MRS. FREER placed her trust in MR. BEETLER to keep his word and pay her 90% of the sale proceeds when received, every party to a contract trusts the other party to honor its terms. Similar to *Woldman*, MR. BEETLER'S only real duty to MRS. FREER was to honor his agreement to turn over her share of the proceeds from sale of the Tractor. As such, this case is simply not a situation involving a breach by a true fiduciary such as where a trustee defrauds a child beneficiary, a lawyer defrauds a client, a general partner defrauds a limited partner, or a landlord spends a tenant's security deposit. *See Woldman*, 92 F.3d at 547; *In re McGee*, 353 F.3d 537 (7th Cir. 2003).[2]

---

[2] Other bankruptcy courts uniformly hold that a consignment, by itself, does not create a fiduciary relationship. *In re Perryman,* 191 B.R. 196 (Bankr.E.D.Okla. 1996); *In re Howell,* 178 B.R. 730 (Bankr.W.D.Tenn. 1995); *Matter of Hyers,* 70 B.R. 764 (Bankr.M.D.Fla. 1987); *In re Sutton,* 39 B.R. 390 (Bankr.M.D.Tenn. 1984); *In re Rigsby,* 18 B.R. 518 (Bankr.E.D.Va. 1982).

7

MRS. FREER also makes the alternative argument that Section 523(a)(4) may still provide her a remedy since it also applies to embezzlement and larceny. Larceny requires that the original taking of the property must be unlawful. *In re Hambley,* 329 B.R. 382, 401 (Bankr.E.D.N.Y. 2005). Because MR. BEETLER'S acquisition of the Tractor, and its proceeds upon sale, was lawful, there was no larceny.

Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. *Matter of Weber,* 892 F.2d 534, 538 (7th Cir. 1989). MR. BEETLER'S possession and sale of the Tractor fulfilled a portion of his duties under the consignment agreement. Thus, he could not have "embezzled" the Tractor by selling it. It is only the sale proceeds that are the possible subject of embezzlement.

There is no dispute that MR. BEETLER deposited Mr. Melvin's check and used the proceeds for his own purposes or for those of his business. The critical issue is whether those proceeds were his property or the property of MRS. FREER. One cannot embezzle property that he lawfully owns. By definition, before a creditor can make a claim of nondischargeability for embezzlement, she must show that the property allegedly embezzled was her property. *In re Dobek,* 278 B.R. 496, 509-10 (Bankr.N.D.Ill. 2002); *In re Conder*, 196 B.R. 104, 111-12 (Bankr.W.D.Wis. 1995). The creditor's ownership of the funds is what distinguishes an embezzlement from a mere debtor-creditor relationship where the debtor simply uses his own money for purposes other than paying the creditor. *In re Rodriguez,* 2007 WL 543750 *5-6 (Bankr.S.D.Tex. 2007); *In re Ramonat,* 82 B.R. 714, 720 (Bankr.E.D.Pa. 1988); *Matter of Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C. 1983).

In order to determine ownership of the proceeds, ownership of the Tractor must be ascertained. The oral agreement between the parties contains no term respecting title.[3] The UCC fills in the missing term.

As argued by MR. BEETLER, since the Tractor was delivered for resale, the transaction, even though called a consignment by the parties, is deemed by operation of law to be a sale or return as defined in UCC Section 2-326. 810 ILCS 5/2-326. That section, however, does not address the issue of title to the goods which is covered, instead, in UCC Section 2-401. In general, Section 2-401 provides that title passes with delivery of the goods. 810 ILCS 5/2-401(2). Once delivered, any contractual provision for the seller to retain title is limited in effect to a security interest. 810 ILCS 5/2-401(1). Therefore, by operation of Section 2-401, title to the Tractor passed to MR. BEETLER when he took possession of it. When he sold the Tractor to Mr. Melvin, he sold goods that he owned and the proceeds of those goods were, therefore, his property as well.[4]

In reaching this conclusion, the Court rejects the position implicit in MRS. FREER'S briefs, that solely by virtue of her status as consignor, she retained title to the Tractor even after delivery to the consignee. Even if that proposition is true as a matter of Illinois common law, that precept is overridden by UCC Section 2-401. *Cf. In re Heister,* 290 B.R. 665 (Bankr.N.D.Iowa 2003) (transactions whereby retired farmer transferred his antique tractors to debtor to fix up and sell, with farmer to receive predetermined amount from sale

---

[3]There was no reference at trial to a bill of sale for the Tractor. If Mr. Melvin was provided one, it was presumably issued by AFE, and signed, if at all, by MR. BEETLER, not issued or signed by MRS. FREER.

[4]It is also notable that MR. BEETLER was not required to segregate or hold in trust MRS. FREER'S portion of the sale proceeds.

proceeds, were conditional sales under which debtor took title upon possession, so that debtor's failure to pay farmer his share of proceeds was not embezzlement).

Because under Illinois law the proceeds from sale of the Tractor were the property of MR. BEETLER, not MRS. FREER, the claim for embezzlement fails.

**Section 523 (a)(2)(A)**

MRS. FREER also alleges that MR. BEETLER is ensnared by the broader nondischargeability net of Section 523(a)(2)(A) which provides that:

> (a) A discharge under Section 727, . . . does not discharge an individual debtor from any debt –
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523 (a)(2)(A).

Although three independent grounds for nondischargeability are listed, courts have historically applied a single, unified test to actions brought under this section. The traditional analysis contains the following elements: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e., an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). In *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), the court, expanding the definition of the term "actual fraud" to include nonrepresentational forms of fraud, stated:

> 'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to

gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.'

*McClellan*, 217 F.3d at 893 (*quoting Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla. 1952). Under the *McClellan* definition, for fraud not involving an affirmative misrepresentation, the creditor must establish (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the dispute. *In re Terranova*, 301 B.R. 509 (Bankr.N.D.Ill. 2003). Since false representations are involved here, it is not necessary to conduct a *McClellan*-type analysis.

MRS. FREER does not contend that the consignment transaction was a scam from the beginning. The evidence supports the conclusion that when the oral agreement was reached in 2003, MR. BEETLER intended to honor the agreement and pay MRS. FREER 90% of the proceeds from sale of the Tractor. He did not falsely represent his intent to perform the contract.

The sale of the Tractor to Mr. Melvin was consummated by MR. BEETLER without any express consent by or notification to MRS. FREER. The false representations made by MR. BEETLER to MRS. FREER began after the sale when he told her over the telephone that the Tractor had not yet sold. He repeated that falsehood several times thereafter. These falsehoods postdated the breach, i.e., the failure to pay. They served to cover up and delay MRS. FREER'S discovery of the breach, but they did not facilitate MR. BEETLER'S acquisition of the Tractor or its proceeds or contribute to the creation of his debt to MRS. FREER.

Section 523(a)(2)(A), however, covers more than just a debtor obtaining money or property by false pretenses, a false representation or actual fraud. It also covers a situation where the debtor obtains an extension, renewal or refinancing of credit through such wrongful conduct. Although it cannot be determined under the facts of this case that MR. BEETLER'S debt to MRS. FREER was renewed or refinanced, it was extended.

Although the Seventh Circuit has not addressed whether a fraudulently obtained forbearance is an extension of credit for purposes of Section 523(a)(2)(A), lower courts in this Circuit have. In *In re Cerar*, 84 B.R. 524 (Bankr.C.D.Ill. 1988), Bernard Cerar obtained a series of loans from a bank that eventually exceeded its legal lending limit to him. At the suggestion of one of the bank's owners, a friend of Cerar's, Cerar forged his son's name to a note and delivered it to the banker, with the intent that the banker would replace one of Cerar's real notes with the son's forged one so as to deceive the bank examiners about the overline loans. The *quid pro quo* for Cerar's participation in the scheme was the banker's threat to foreclose on the collateral for Cerar's loans if he did not cooperate and agreement to forebear if he acquiesced.

Apparently, the scheme worked and the examiners were fooled. Seven months after the forgery, however, the bank failed and the FDIC was appointed receiver. After Cerar filed for bankruptcy relief, the FDIC learned of the forgery and filed a nondischargeability complaint alleging, among other things, that the execution and delivery of the forged note constituted the obtaining of an extension of credit by false pretenses, false representation or actual fraud.

Cerar answered that he received nothing more than a forbearance that did not amount to an extension of credit. The bankruptcy court rejected Cerar's position as

12

follows:

> Relying on *In re Bacher,* 47 B.R. 825 (Bkrtcy.E.D.Penn. 1985), CERAR's second position is that the forged note amounted to a forbearance, and forbearance does not constitute a granting of credit or extension or renewal or refinancing of credit. This Court believes the better view to be that forbearance may constitute an extension of credit. In *In re Fields,* 44 B.R. 322 (Bkrtcy.S.D.Fla. 1984), the debtor sold property in which the creditor had a security interest without turning any of the proceeds over to the creditor, in contravention of the security agreement. When the creditor visited the debtor's business premises to check on its inventory, the debtor temporarily procured the return of the equipment from the purchasers. Discussing whether the debtor obtained an extension of credit, the court noted:
>
>> "'In commercial law and usage, an extension means an indulgence by a creditor giving his debtor further time to pay an existing debt. When we speak of obtaining an extension of a promissory note or other obligation, we mean, not an increasing of the amount of the debt, but an extension of the time of payment.' *State v. Mestayer,* 144 La. 601, 80 So. 891, 892 (1919) (Citation omitted)."
>
> The court, in holding that the creditor "involuntarily" granted an extension of credit, went on to state that the statute should not be construed to protect only those creditors who voluntarily grant an extension of credit but not those who are deceived into forbearing collection efforts. In the case before this Court there was an agreement, certainly tacit if not express, that the BANK would forgo collection efforts if CERAR would forge his son's signature to a second note, thereby extending the repayment of the note.

*Cerar,* 84 B.R. at 529. The court granted judgment for the FDIC under Section 523(a)(2)(A). Particularly instructive is the court's reliance on *Fields* for the proposition that the extension of the time of payment may be involuntary or unknowing by the creditor, and still be actionable. The *Cerar* decision was appealed and affirmed by the district court. *In re Cerar,* 97 B.R. 447 (C.D.Ill. 1989) (Mihm, J.).

Other decisions from lower courts within the Seventh Circuit that take the position that forbearance from enforcing contractual rights is an extension of credit under Section

13

523(a)(2) include *Chapman v. Frakes,* 1991 WL 247602 (N.D.Ill. 1991) (Kocoras, J.); *In re Broholm,* 310 B.R. 864, 873-74 (Bankr.N.D.Ill. 2004) (Schmetterer, J.); *In re Brzakala,* 305 B.R. 705, 711 (Bankr.N.D.Ill. 2004) (Goldgar, J.); *In re Hoffman,* 80 B.R. 924 (Bankr.N.D.Ill. 1988) (Ginsberg, J.); *Matter of Eaton,* 41 B.R. 800 (Bankr.E.D.Wis. 1984) (Clevert, J.); *In re Wyss,* 355 B.R. 130 (Bankr.W.D.Wis. 2006) (Utschig, J.). *Contra, In re Guy,* 101 B.R. 961 (Bankr.N.D.Ind. 1988) (noting that, in order to prevent discharge under § 523(a)(2)(A), a creditor must have given present consideration based on actual fraud).

The circuit courts unanimously favor the view that forbearance can be an extension of credit. *In re Biondo,* 180 F.3d 126 (4th Cir. 1999); *In re Campbell,* 159 F.3d 963, 966 (6th Cir. 1998); *Field v. Mans,* 157 F.3d 35, 43 (1st. Cir. 1998); *In re Gerlach,* 897 F.2d 1048 (10th Cir. 1990) (§ 523(a)(2) protects a creditor who is deceived into forbearing from collection).

In *Field v. Mans*, creditors held a second mortgage on real estate securing a corporate note personally guaranteed by the debtor. In violation of the mortgage, the debtor sold the real estate without the knowledge or consent of the creditors. After the sale, the debtor's lawyer twice wrote to the creditors' lawyer requesting that the creditors consent to a proposed sale, without revealing that the sale had already occurred. The creditors rejected the request.

Three years later, the debtor filed a Chapter 11 petition and stopped making the mortgage payments to the creditors. Three months after the bankruptcy filing, the creditors learned of the prior conveyance and filed a complaint under Section 523(a)(2)(A). The creditors contended that the debtor's attorney's two letters, seeking after-the-fact permission to sell the real estate, fraudulently caused them to believe that it had not yet

14

been sold, and therefore to forego their right to accelerate the note under the due-on-sale clause. As a result, they argued, the debtor obtained an involuntary extension of credit by fraud.

Agreeing with the creditors, the First Circuit reasoned that by misleading the creditors into believing no sale had occurred, thereby preventing them from exercising their acceleration right, the debtor ensured that the debtor-creditor relationship would continue unaltered, by fraudulently forestalling the creditors' right to end it and take action to collect the entire debt. 157 F.3d at 43. It is no great leap, stated the court, to say that fraudulent concealment and frustration of the creditors' acceleration right was tantamount to an extension, i.e., continuation of the existing credit. *Id.* While the concealed sale was not technically a new agreement concerning the existing credit, it triggered legal rights under the contract which markedly altered the credit relationship between the parties. *Id.*

The First Circuit also rejected the argument that in order for failure to accelerate to be equivalent to an extension of credit, there would have to be a virtual certainty that acceleration would have occurred, finding it sufficient that the creditors could have taken action had they known the truth about the sale. *Id.* at 44-45. The court also circumspectly limited the scope of its holding to cases of actual, proven fraud and cases where there is a reasonable basis to believe the creditor might have recovered the property or collected the debt in the absence of the delay caused by the fraud, cautioning against the danger that creditors may seek to twist mere breaches of contract or negligent errors into actual frauds. *Id.* at 46.

This Court agrees that, under certain circumstances, fraudulently induced forbearance may constitute an extension of credit for purposes of Section 523(a)(2)(A). The

15

fraud must result in discernable harm to the creditor in the sense that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that the remedies lost value during the extension period. *See Wyss,* 355 B.R. at 136.

Upon the evidence adduced at trial, the Court determines that MRS. FREER proved her claim under Section 523(a)(2)(A). MR. BEETLER sold the Tractor on October 28, 2004. MRS. FREER did not finally learn of the sale until January, 2006, fifteen months later. She called him on numerous occasions during that period and he repeatedly told her the Tractor had not sold. His denials ultimately included an embellished story, told her in the spring of 2005, that he thought he had it sold to a "kid" who was opening a landscaping business. The kid, MRS. FREER was told, could not afford to pay cash and proposed to pay the purchase price in installments. MRS. FREER told MR. BEETLER she would not accept payments so the fictitious "sale to the kid" fell through.

These post-sale misrepresentations by MR. BEETLER were known to be false by him when made. The Court determines that he made the misrepresentations with the intent and purpose of deceiving MRS. FREER, his intent being to buy more time with which to come up with the funds to pay her.[5] AFE had begun to experience financial trouble in the months leading up to the Tractor sale in the fall of 2004, that deepened throughout 2005, until the business closed its doors in November, 2005. MR. BEETLER was well aware that if MRS. FREER learned that the Tractor had been sold and sued him for a debt that he could not pay, that an unsatisfied judgment would further impair AFE's chances of

---

[5] He probably also felt guilty about having spent the sale proceeds for other purposes and was ashamed to tell her the truth, but that is beside the point.

16

recovery. By using the misrepresentations to hold off MRS. FREER, MR. BEETLER hoped to convince her to accept installment payments from some fictitious purchaser, such as the kid with the landscaping business. He obviously believed he might be able to pay off the debt in installments as opposed to having to pay it in full all at once.

There is no question that MRS. FREER actually relied on the misrepresentations. She was concerned about the situation and the more time went by with no sale, the greater her concerns became. As soon as she learned the truth in early 2006, she filed suit and took a judgment. It follows as a reasonable inference that had she known the truth earlier, she would have sued earlier. Her reliance was entirely justifiable. She had no reason to suspect that MR. BEETLER was lying to her. Her only contact with AFE was by telephone and no red flags appeared to give her cause for suspicion until she received the $1,500 check in October, 2005, with no explanation as to its meaning. Until then, she accepted MR. BEETLER at his word that the Tractor had not been sold and her reliance was justifiable.

The final element of proof under Section 523(a)(2)(A) is that the plaintiff sustained a loss or was harmed as the proximate consequence of her reliance on the misrepresentations. In this case involving fraudulently induced forbearance, the proof required is that MRS. FREER had valuable collection remedies at the time of the misrepresentations, that she did not exercise those remedies because of the fraud, and that the remedies lost value during the time that the fraud was extant. Inferential proof is to be expected and is sufficient. As the First Circuit concluded in *Field v. Mans,* it is enough of a showing that, when the fraud occurred, the economic circumstances would have allowed recovery of the debt. 157 F.3d at 45.

17

Two critical facts are compelling. First, when the Tractor was sold in October, 2004, AFE was still at the front end of its slide into insolvency. It's financial troubles became severe only later. Second, the length of time between the sale and AFE's demise is substantial. Thirteen months elapsed before AFE closed its doors, and twenty months went by before the DEBTORS sought bankruptcy protection. The sale of the Tractor and the subsequent fraud did not occur at a time when the DEBTORS were hopelessly insolvent and on the verge of bankruptcy. The business continued to operate and its debts continued to be paid for more than a year. Moreover, the sum due, $9,000, was not so large as to be beyond AFE's ability to pay, relative to what it must have been paying to other creditors. Under these circumstances, it is more likely than not that MRS. FREER would have collected her debt if she had learned of the sale when it occurred or within a few months thereafter.

This is much more than a situation where a debtor tells a creditor to whom a debt is due that the check is in the mail or that payment will be made soon, where no intent to pay is present. MR. BEETLER misrepresented the very contingency – sale of the Tractor – that triggered the obligation to pay. MRS. FREER ended up extending credit to MR. BEETLER, interest-free, for more than a year, on an involuntary and unknowing basis. While there was not technically an agreement by MRS. FREER to turn the cash-upon-sale deal into one for credit, the sale triggered legal rights under the contract which markedly altered the relationship between the parties. Believing the critical event of sale not to have yet occurred, MRS. FREER was lulled into a false sense of complacency. She was unaware that MR. BEELTER owed her a present obligation for 90% of the purchase price. Her

complacency and unawareness were caused by the false statements, which was MR. BEETLER'S purpose in making them.

As to the amount of the debt, the evidence supports the determination that the Tractor sold to Mr. Melvin for $10,000 and that MRS. FREER'S share was $9,000. Although she obtained a state court judgment by default for a higher amount, this Court has previously held that default judgments are not accorded collateral estoppel effect. *In re Dealey,* 2006 WL 211944 (Bankr.C.D.Ill. 2006). The amount of the debt is to be determined under state law, however, and as the holder of a liquidated debt, MRS. FREER is entitled to interest at 5% per annum under Illinois law.[6] From the date of sale until bankruptcy, interest accrued in the amount of $731.10.[7]

MRS. BEETLER made no misrepresentations and played no role in the fraudulent scheme. There is no basis for denying the discharge of MRS. FREER'S debt as to her. A judgment of nondischargeability will enter against MR. BEETLER under Section 523(a)(2)(A) in the amount of $9,731.10 plus costs of suit. In light of this result, there is no need to consider the alternative claim under Section 523(a)(6).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[6] Under 815 ILCS 205/1, a creditor is entitled to such interest upon the "forbearance" of any money due. Under 815 ILCS 205/2, a creditor is entitled to such interest "on money received to the use of another and retained without the owner's knowledge."

[7] $1.233 per day for 593 days.